# Federal Defenders
## OF NEW YORK, INC.

Southern District
300 Quarropas Street, Room 260
White Plains, N.Y. 10601-4150
Tel: (914) 428-7124  Fax: (914) 997-6872

David E. Patton
*Executive Director*
*and Attorney-in-Chief*

Susanne Brody
*Attorney-in-Charge*
*White Plains*

March 3, 2020

The Honorable Vincent L. Briccetti
United States District Court Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

Re:     *United States v. Patrick Williams*, 19cr0845-VB

Dear Judge Briccetti:

I write on behalf of my client, Patrick Williams, who is scheduled to be sentenced by the Court on March 13, 2020.  On November 21, 2019, Mr. Williams pleaded guilty to a one-count Information in the above captioned case, which charges him with violating 18 U.S.C. § 922(g)(1), based upon his possessing two firearms after being convicted of a felony.

A plea agreement between the parties identifies a guidelines calculation that begins with a base offense level of 14 pursuant to U.S.S.G. § 2K2.1(a)(6) and concludes with a total adjusted offense level of 17, which produces a guideline range of 37 to 46 months' custody.  Mr. Williams requests that the Court impose a sentence of 18-months' custody, which based upon the equities presented is the greatest sentence that is consistent with the parsimony clause at 18 U.S.C. § 3553(a).

The instant letter analyzes the factors this Court should consider in fashioning a sentence for his convictions.  The letter begins with the guideline calculations, and then explains how and why the sentence requested is appropriate pursuant to 18 U.S.C. § 3553(a).

### A.     The Sentencing Guidelines Calculations in This Case Pursuant to the Plea Agreement.

The guidelines for the § 922(g)(1) violation start with a base offense level of 14.  See U.S.S.G. § 2K2.1(a)(6).  A four-level upward adjustment applies pursuant to § 2K2.1(b)(4)(B) based upon one firearm having an obliterated serial number.  A two-level upward adjustment applies pursuant to § 3C1.2 based upon reckless endangerment during flight.  A 3-level reduction for acceptance of responsibility reduces the total adjusted offense level to 17.

Mr. Williams has seven criminal history points, which places him in criminal history category IV and produces a range of 37 to 46 months' imprisonment.

The Presentence Report's (PSR) guidelines calculations are the same, PSR at ¶¶ 17-27, including

March 3, 2020
*United States v. Williams*, 19cr0845-VB
Page 2

the criminal history category placement. Id. at ¶ 34.

**B.    The Individual Before the Court.**

**1.    Mr. Williams's Background.**

Through no fault of his own, Mr. Williams did not have the easiest childhood. Growing up for him, to put it simply, was beyond difficult. It was full of loss and violence with little support and guidance. When Mr. Williams was two years old, his father shot and killed his mother. Though his father served a short prison term, Mr. Williams has had no contact with his father since the shooting. Mr. Williams's maternal grandmother, Betty Wannamaker, subsequently took in Mr. Williams. She raised him and his older brother, Bernard. For many years, Mr. Williams was led to believe that she was his biological mother. The two shared a very strained relationship when he was a child and adolescent. Ms. Wannamaker treated him very differently than his sibling. Mr. Williams believes that he reminded Ms. Wannamaker of his father, by last name and by appearance. Understandably, Ms. Wannamaker had difficulty grieving her daughter's death and Mr. Williams presence in the home immediately thereafter may have frustrated that process.

To make matters worse, Mr. Williams's older brother was hardly a protective, doting sibling. Bernard physically "tortured him with beatings and near drownings." PSR at ¶ 44. When Mr. Williams retreated to his grandmother for help, she simply told him to fight back. In September 2008, Mr. Williams lost his brother to neighborhood gang violence. Bernard was violently murdered a block from Ms. Wannamaker's home in Brooklyn. Understandably, these losses added up for Mr. Williams.[1] Coupled with his school-struggles, which put him at six different high schools in a matter of years, his teenage years were atypical as well.

Perhaps unsurprisingly, Mr. Williams began using drugs at a young age. His fragile mental health and lack of parental supervision formed a toxic combination. Mr. Williams quickly appreciated how drugs made him feel. Unlike other kids his age, Mr. Williams was not using simply out of rebellion or to fit in with peers. According to Ms. Larson, Mr. Williams

> was filled with shame and anger during adolescence. Both his mother and brother
> had died by stabbing. He felt immense survivor's guilt and struggled to regulate his

---

[1] When undersigned counsel first met Mr. Williams in the courthouse basement prior to his initial appearance, he would go from speaking normally to crying and shaking uncontrollably at times. His mood seemed far from normal, which prompted an evaluation by Brittany Larson, who is a Licensed Master Social Worker at Federal Defenders of New York. Ms. Larson prepared a report of her findings with regard to Mr. Williams. Exhibit A ("Larson Report"). Ms. Larson and other social workers with Federal Defenders have worked closely with Mr. Williams since July 2019, seeing him regularly in jail. Id. at 1. Ms. Larson's report detailed Mr. Williams's difficult childhood, including his brother's abuse. Id. at 1-3.

March 3, 2020
*United States v. Williams*, 19cr0845-VB
Page 3

> emotions in at home and in school. Patrick heavily used substances (marijuana, alcohol, benzodiazepines, methamphetamine) to regulate his mood and escape from reality.

Report at 2. Moreover, according to Ms. Larson, Mr. Williams's "family system and socialization taught [him] that the language of violence was the best way to stay safe and to express himself." Id. at 1. Left untreated and unchecked, Mr. Williams's anger became the root cause of his schooling issues. "The content of the material was never the challenge for Patrick, rather it was the peers who provoked him, the schools that failed to provide safety and counseling, the teachers who failed to challenge him, and security staff who treated him like a criminal." Id. at 2. Bouncing from school to school prevented Mr. Williams from finding stability in what should have been a safe place for him.

Even in his late twenties, losses continued to haunt Mr. Williams. He believed that forming his own family would allow him to be loved unconditionally and accepted no matter his past. In this vein, Mr. Williams fortunately found a supportive partner. He has been in a committed relationship for two years with his girlfriend Taeisha Ruff.[2]  PSR at ¶ 45. Mr. Williams and Ms. Ruff have been trying to start a family and have children of their own. Sadly, this has not happened. Mr Williams and Ms. Ruff twice have suffered the loss a child during pregnancy. The first was in 2018.

> Patrick was elated to find out he and his girlfriend were expecting a child in 2018. He believed having a child of his own would heal some of the wounds he experienced as a child. When Taeisha delivered a stillborn child, Patrick was ravaged with all too familiar grief and loss.

Larson Report at 3. The second was within days of his arrest in July 2019, which gives rise to the charge of conviction. "They were able to get pregnant again; however, Taeisha had a miscarriage in early July 2019 at 6 months." Id. Ms. Larson's report discusses the emotional impact of losing a child during pregnancy for both parents. "The loss of a child is devastating and can escalate mental health issues and lead to the development of new mental health problems." Id. As Ms. Larson also notes, Mr. Williams had lost "lost two friends to gun violence" in the Spring of 2019. Id.

### 2.    Conduct Leading to Arrest.

These losses spiraled Mr. Williams's life out of control and to the point where he was suicidal. That suicidality is the underlying reason for his possession of the two firearms, which he had retrieved from a deceased friend's (one of the two friends lost in the Spring of 2019) home just two hours prior to his arrest. As explained in the PSR, "[t]he defendant reported that he obtained two firearms from the home of a deceased friend, had the firearms for approximately two hours and intended to

---

[2] A letter from Ms. Ruff is attached hereto as Exhibit B.

March 3, 2020
*United States v. Williams*, 19cr0845-VB
Page 4

kill himself because two of his close friends died, his godson was murdered and his girlfriend had a miscarriage on July 5, 2019." PSR at ¶ 16.

> Overwhelmed and unable to make sense of continued devastating losses, Patrick felt utterly depressed and experienced despair and suicidal thoughts. Despite his intelligence and self-reflective capacity, Patrick has struggled with self-blame and self-loathing as tragedy and ruin seemed to follow him in many of his personal and family relationships. Patrick could have benefitted from mental health and substance use treatment for the chronic childhood physical and emotional trauma he experienced. More than ever in 2019, Patrick needed crisis mental health services for the acute loss of two pregnancies.
>
> He desperately wanted to escape what seemed like an endless cycle of loss, trauma and tragedy. On July 10, 2019, Patrick experienced acute suicidal ideation. He was under the influence of substances, took his best friend's car upstate with the intention to end his life with a gun.

Larson Report at 3-4. Ms. Larson's review of New York Presbyterian Hospital records from Mr. Williams's admission subsequent to arrest confirmed her conclusions.

> On July 11, 2019, Patrick woke up in New York Presbyterian Hospital in Cortlandt Manor, NY handcuffed to the bed. Hospital records report an altered mental state. That is, they had little history about Patrick but it was clear that he was experiencing acute mental health crisis. Toxicology screens show he had alcohol, marijuana and amphetamines in his system. In fact, his behavior could suggest an intent to self-harm or end his life.

Id. at 4. Even days later when Ms. Larson met with Mr. Williams at the jail on July 12, 2019, "[h]is affect (behavioral expression of emotion) was sad, angry and hopeless." Id. at 4.

### 3.     Mr. Williams's Plans Going Forward.

Mr. Williams has put a great deal of thought into his future and what he can do to better his circumstances after he completes any term of incarceration. First and foremost, he is eager for continued mental health treatment. His positive response to the efforts of Federal Defender social workers evidences that desire. "Through regular visits with the undersigned social workers, Patrick has been engaged and reflective about his family system, substance use, mental health and the events of early 2019 that triggered his desperate drive on July 10, 2019 and subsequent arrest." Larson Report at 4. Mr. Williams knows that continued treatment in the future, both while in custody and

March 3, 2020
*United States v. Williams*, 19cr0845-VB
Page 5

during any term of supervised release, is key to his mental health and maintaining stability.[3]

As is apparent from Ms. Larson's report, Mr. Williams is treatable and he already has made progress since arrest despite being in jail.

> During social work visits at Westchester County and Orange County Jails, Patrick has developed insight into his behaviors. He is quite affable and kind. It is clear that his distress and anger is often internalized, putting himself at risk for depression and suicidal ideation.
>
> His ability to reflect suggests psychotherapy with a non-judgmental and supportive clinician could significantly help Patrick to gain insight, develop awareness how thoughts and emotions affect behavior and avoid reliance on substances. It is imperative that such treatment is with a clinician who seeks to understand and support Patrick, rather than punish him or force him into behavior change.

Id. at 5.

Second to maintaining his mental health, Mr. Williams "desperately wants to join the labor force and provide for his mother (grandmother) and loved ones." Id.

According to Ms. Larson, Mr. Williams "has a big heart and is motivated to help himself to be a support to family and friends."[4] Id. at 6. Fortunately, Mr. Williams also has a better, more positive relationship with his grandmother. She is supportive of him and expressed her welcoming him back to her home upon release. PSR at ¶ 47 ("The defendant's grandmother reported that she will remain emotionally supportive of the defendant and once he is released to the community, he is welcome to resume residence with her"). With Ms. Ruff's support and that of others, including his grandmother and other family and friends[5], Mr. Williams has a small, but supportive community available to help him upon release from custody.

---

[3] Mr. Williams cannot be faulted for a lack of meaningful treatment before his arrest. According to Ms. Larson, "[p]sychologically, his behavior can be understood as a cry for help. Patrick needs more emotional and psychological support; he has failed to receive critical support from NYC Department of Education, NYC Department of Corrections, NYS Parole, and one inadequate treatment program, Reborn for New Life." Larson Report at 5. And, the state parole mandated drug treatment program he attended "provided sub-par services" and actually "dissolved because of fraudulent activity." Id. at 3.

[4] As she always volunteers, Ms. Larson is available to assist federal probation and any treatment providers with Mr. Williams's treatment. Larson Report at 6.

[5] Letters of support are attached hereto as Exhibit C.

March 3, 2020
*United States v. Williams*, 19cr0845-VB
Page 6

**C.      Factors That Should Be Considered in Sentencing Mr. Williams.**

Section 3553(a) of Title 8 of the United States Code mandates that the Court impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." § 3553(a).  Below are the § 3553 factors and their application to Mr. Williams in support of the requested sentence.

**1.      The Nature and Circumstances of the Offense.**

The offense of conviction involves Mr. Williams's possession of two firearms, including one with an obliterated serial number.  Notably, Mr. Williams did not file down the serial number on the firearm, which was in that condition at the time he retrieved it from his deceased friend's home.  Mr. Williams retrieved the firearms just two hours prior to arrest, and at the time was under the influence of "alcohol, marijuana and amphetamines." Larson Report at 4.   He also "was experiencing acute mental health crisis."  Id.  Lacking mental health treatment, Mr. Williams was caught in a vicious cycle of "struggl[ing] to regulate his thoughts and emotions without drugs and alcohol."  Id.

As touched on above, Mr. Williams's conduct was motivated by suicidal ideation.  Mr. Larson opines that "[o]n July 10, 2019, Patrick experienced acute suicidal ideation.  He was under the influence of substances, took his best friend's car upstate with the intention to end his life with a gun."  Larson Report at 4.  Mr. Williams knew that his deceased friend had two firearms at his family's home, which Mr. Williams retrieved just two hours before arrest.  Consistent with Mr. Williams's explanation to probation, Mr. Williams never intended to shoot anybody or use the weapon in any menacing way against anybody; he only "intended to kill himself."  PSR at ¶ 16. Accordingly, Mr. Williams's motivation for possessing the firearm must be considered pursuant to § 3553(a) as sufficiently mitigating to warrant a below guidelines sentence.  See e.g., United States v. Mahan, 2007 WL 1430288 (10th Cir. 2007) (unpub.) (reversing and vacating imposition of 77-month guideline sentence for defendant convicted of felon in possession because district court wrongly refused to consider defendant's asserted motive for carrying the shotgun; namely to use as a club to protect himself and his wife after he had just been beaten, which is a relevant "circumstance" under a Booker analysis); United States v. Williams, 432 F.3d 621 (6th Cir. 2005) (affirming decision to depart downward from 48 to 24 months pursuant to § 3553(a) and U.S.S.G. § 5K2.11, which permits a departure in cases where a defendant commits a crime in order to avoid a perceived greater harm, in felon in possession case because defendant possessed firearm for self defense in light of threats he had received).

Mr. Williams also regrets his response to law enforcement on July 11, 2019 (a Thursday).  Under the influence of multiple drugs and "experiencing acute mental health crisis," he failed to yield to New York State Troopers.  Admittedly, Mr. Williams's car and the troopers' car collided during flight.  Fortunately, neither of the troopers was injured.  No other drivers or pedestrians were injured either.   Minimal traffic likely was on the road given the early morning hour of the flight (approximately 1:30 a.m.).  Once the pursuit ended, Mr. Williams "exited the vehicle and placed his

March 3, 2020
*United States v. Williams*, 19cr0845-VB
Page 7

hands up in the air," PSR at ¶ 9, and identified himself. Id. at ¶ 10. Troopers recovered the two firearms beneath the driver's seat. Id. at ¶ 9.

Consistent with his acceptance of responsibility, Mr. Williams entered a plea of guilty before the Court and allocuted regarding his conduct underlying the single count in the Information. He has accepted full responsibility. PSR at ¶¶ 15-16.

### 2.      History and Characteristics of The Defendant.

As discussed in detail above, Mr. Williams tragically lost his parents as a toddler and was raised by his grandmother. His relationship as a child and teenager with his grandmother as tepid at times and he was outright physically abused by his older brother. Mr. Williams had no relationship with other family members and lacked a parental figure who took an active and thorough interest in his welfare as a child or adolescent. He learned the "language of violence" at a young age. Larson Report at 1. Having come from such a background as a child, Mr. Williams began suffering from mental health and anger issues at a young age. Mr. Williams also began abusing drugs at a very young to address the former. The latter interfered with schooling, but fortunately appears to have abated as an adult. Prior to arrest, Mr. Williams lacked any meaningful treatment to address his mental health issues, his drug use, the traumatic events he has experienced, including all the losses he endured as a child and more recently as an adult. Since entering custody, he has made significant and positive mental health strides with the assistance of Federal Defenders social workers.

Based upon these and the other equities discussed above, the Court should consider in mitigation Mr. Williams's troubled upbringing, including the loss of his parents, the emotional and psychological abuse he endured from his grandmother, the physical abuse he endured from his brother, and the drug use that started at a very young age to self-medicate what are very serious mental health issues, which contributed to his behavior to a significant degree. The Second Circuit in United States v. Rivera, 192 F.3d 81 (2d Cir. 1999), observed that "[i]t seems beyond question that abuse suffered during childhood-at some level of severity-can impair a person's mental and emotional conditions." 192 F.3d at 85; see also United States v. Roe, 976 F.2d 1216, 1218 (9th Cir.1992) (stating that 'victims of [child] abuse frequently experience profound feelings of inadequacy, isolation, confusion, low self-esteem, and guilt" and that "[e]ach of these effects constitutes either a mental or emotional condition'). Mr. Williams's traumatic background and, according to Ms. Larson, corresponding mental health issues are consistent with these judicial observations.

More importantly, Ms. Larson opines that Mr. Williams's mental health issues (his suicidality in particular) and drug use drove the conduct in this case. Larson Report at 4. Case law suggests that criminal culpability is lessened when such circumstances exist. See e.g., Karis v. Calderon, 283 F.3d 1117, 1134 (9th Cir. 2002) ( "There is a belief, long held by this society, that defendants who

March 3, 2020
*United States v. Williams*, 19cr0845-VB
Page 8

commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse.").[6]

The Court also should consider Mr. Williams's lack of youthful guidance as a child and teenager as a basis for a variance. See e.g., Landrigan v. Schriro, 441 F.3d 638, 648 (9th Cir. 2006) ("Where a defendant's crime is attributable to a disadvantaged background or emotional or mental problems the defendant is less culpable than one without the excuse.").

Even though in custody, Mr. Williams has conducted himself in a manner that evidences some degree of post-*arrest* rehabilitation. First, he has pleaded guilty and does not minimize or deny the offense conduct. Mr. Williams also has remained free of an misconduct while in custody. More importantly, Mr. Williams has been actively engaged in regular treatment with social workers to address his mental health issues - the precipitating circumstance for the offense conduct in this case. To some degree, such efforts demonstrate post-arrest, pre-sentencing rehabilitation, which mitigate the need for a custodial sanction greater than that being requested. See Pepper v. United States, 131 S. Ct. 1229 (2011).

Mr. Williams's desire for treatment and his future planning in this regard mitigates. Cf. United States v. Seethaler, 2000 WL 1373670, *2 (N.D.N.Y. 2000) (unpub.) (departing downward 16 months for post-offense rehabilitation where defendant resolved sexual fetish and had no continuing urges to search for pornography on the internet).

While Mr. Williams has a criminal history, the conduct for the single conviction occurred in May 2011, which is almost nine years ago. Mr. Williams was only 23 at the time, too. Ms. Larson has discussed the 2011 conduct with Mr. Williams. Larson Report at 2. He sold the firearms at issue "[i]n efforts to help his mother (grandmother Betty) who was in dire financial straits" at the time. Id. Mr. Williams's young age at the time of his early convictions only compounded the impact drugs had on his decision making and also mitigates. Youthfulness carries with it impetuousness and a marked difference in reasoning skills when compared to older, more developed adults with life experience. See Gall v. United States, 552 U.S. 38 (2007) (explaining that district court's sentence of probation was reasonable in part because of defendant's youth an immaturity at time of the crime and district court's "consideration of [defendant's immaturity] find support in our cases").

---

[6] Consistent with the terms of the plea agreement, Mr. Williams is not seeking adjustments or departures based upon any equities set forth herein. His sentencing request is based upon the factors at § 3553(a). Any cases cited in support of his request are submitted in support of his § 3553(a) arguments. Though some of the cases discuss and rely upon departures, they are cited to demonstrate the mitigating nature of Mr. Williams's characteristics and not the applicability of a guidelines departure.

March 3, 2020
*United States v. Williams*, 19cr0845-VB
Page 9

       **3.**      **The Need for the Sentence Imposed.**

           **a.**      **Reflect Seriousness of Offense/Promote Respect for the Law/Provide Just Punishment.**

These factors warrant a sentence of 18 months' custody. Though the instant sentence falls below the guidelines range calculated pursuant to the guidelines, equities and treatment needs exist in support of the request. Eighteen months' custody is not a short duration of time and even with good-time credit will result in Mr. Williams serving more than a year in custody and require him to serve a years-long period of supervised release. Thus, it would accurately reflect the seriousness of the offense and take into account the motivations for the conduct, i.e., possessing the firearms with intention of committing suicide. The length of the requested sentence, which is not necessarily short especially when factoring in supervised release, also will promote respect for the law. Finally, and thankfully, nobody was injured as a result of his behavior. Mr. Williams has expressed remorse regarding his conduct. Thus, the requested sentence is a just punishment.

           **b.**      **Afford Adequate Deterrence and Protect the Public from Further Crimes.**

As stated above, an 18-month sentence is not a short one and will have a deterrent effect on Mr. Williams. It also will send a message generally to others than such conduct will carry serious penalties. Thus, both specific and general deterrence is satisfied. In addition, Mr. Williams understands that if he were to violate any of mandatory conditions of supervised release subsequent to his release, or any discretionary conditions imposed by this Court, pursuant to 18 U.S.C. § 3583, he will return to Court and receive a lengthy custodial sentence in prison. See 18 U.S.C. § 3583(e)(3). In this vein, treatment for mental health and drug abuse issues should be considered as conditions of supervised release.

The need to protect the public does not necessarily militate for a lengthier sentence in this case. While Mr. Williams acknowledges that any association with firearms for illegal purposes is potentially unsafe, there is no allegation that during the offense conduct in this case he was involved in assaultive or affirmatively violent conduct with those firearms. That was hardly his motive for possessing them. Though he has a prior conviction relating to the sale of firearms, Mr. Williams has never used a firearm to scare or threaten anybody. Moreover, the conduct in this case is tied to mental health issues and the use of drugs. While he failed to yield to law enforcement prior to arrest, that was a reaction to the circumstances, was not premeditated and likely was a byproduct of his mental state at the time. Treating Mr. Williams's mental health issues will not only stem his use of drugs, it also will give Mr. Williams a better chance to remain free of recidivating in the future and protect the public.

March 3, 2020
*United States v. Williams*, 19cr0845-VB
Page 10

        c.    **To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.**

Mr. Williams believes this particular factor has particular applicability here given the extent of his mental health issues. The sentence imposed in this case should be one that allows Mr. Williams to resume treatment as soon as possible. Ms. Larson notes that "there are few psychotherapy or talk therapy treatments available in the Bureau of Prisons." Larson Report at 6. This means that treatment during supervised release likely will be the next logical step for Mr. Williams once he is transferred to a Bureau of Prisons' facility and no longer able to meet with Federal Defenders social workers. Such treatment will enhance his chances at stability and sobriety and reduce any future risk of recidivism. See United States v. Bidon, 2006 WL 3025876, 5 (S.D.N.Y. 2006) (holding that rehabilitation also serves as a goal of punishment pursuant to § 3553(a)(2)(D), which allows the Court to consider whether the sentence imposed will "provide the defendant with needed . . . medical care, or other corrective treatment in the most effective manner") (citing cases).

### 4.    The Kinds of Sentences Available.

Due to the decision in United States v. Booker, 543 U.S. 220 (2005), this Court has many sentencing options, including: probation, time served or a custodial sentence that is sufficient but not greater than necessary. Thus, the requested sentence is permissible.

### D.    Conclusion.

After considering the United States Sentencing Guidelines and the additional factors addressed above, this Court should sentence Mr. Williams to a term of 18-months' custody, which is sufficient but not greater than necessary.

Respectfully Submitted,


/s Jason Ser
Jason I. Ser
Assistant Federal Defender


cc: Christopher Brumwell, A.U.S.A.